UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

              Plaintiff,

   v.

**GAVIN AWERBUCH, M.D.,**

              Defendant.
_____/

                      **HONORABLE ARTHUR J. TARNOW**

                      **No. 16-20636**


**SENTENCING HEARING**


**Monday, February 26, 2018**


Appearances:

FOR THE PLAINTIFF:                 JOHN K. NEAL, ESQ.
                                 PHILIP A. ROSS, ESQ.
FOR THE DEFENDANT:                MARK J. KRIGER, ESQ.
                                 LAWRENCE H. BRENNER, ESQ.

-   -   -

*To obtain a certified transcript, contact:*
*Lawrence R. Przybysz, MA, CSR, RPR, RMR, CRR*
*Official Federal Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 124*
*Detroit, Michigan  48226*
*(313)414-4460.  Lawrence_Przybysz@mied.uscourts.gov*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Sentencing Hearing*
*Monday, February 26, 2018*

# I  N  D  E  X

– – –

SENTENCING HEARING..............................P. 3

*16-20636; UNITED STATES OF AMERICA v. Gavin Awerbuch, M.D.*

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 3

1                    Detroit, Michigan

2                    Monday, February 26, 2018

3                    2:00 p.m.

4                    -   -   -

5          **THE COURT CLERK:**  The court calls case number

6  16-20636, United States of America versus Gavin Awerbuch.  Will

7  counsel please identify themselves for the record?

8          **MR. NEAL:**  Good afternoon, your Honor.  John Neal

9  appearing on behalf of the United States.

10         **MR. ROSS:**  Philip Ross, forfeiture counsel, for the

11  United States.

12         **MR. KRIGER:**  Mark Kriger for Doctor Awerbuch.

13         **MR. BRENNER:**  Larry Brenner on behalf of Doctor

14  Awerbuch.

15         **THE COURT:**  Is Doctor Awerbuch here?  Please,

16  approach the lecturn with your attorney or attorneys.  To all

17  of you, good afternoon.  And to all of you in the audience,

18  welcome.  Now, you remember you are under oath.

19         **THE DEFENDANT:**  Yes, your Honor.

20         **THE COURT:**  Okay.  Remember what I told us at the

21  time of the plea, that is, if I talk too fast or I mumble or

22  you don't understand what I am saying, stop me.  Obviously this

23  is an important day in your life, extraordinarily important

24  day.  And so it's important you know what is going on.  I note

25  that you are on bond, is that correct?

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 4

1          **THE DEFENDANT:**  Yes.

2          **THE COURT:**  Which means I will ask you in the last 12

3   hours have you had any alcohol, prescription drugs, or other

4   drugs that would make it hard for you to understand what I am

5   saying?

6          **THE DEFENDANT:**  No.

7          **THE COURT:**  Is there any reason you can think of that

8   we should not proceed today?

9          **THE DEFENDANT:**  No.

10          **THE COURT:**  What is the procedure today?

11          **THE DEFENDANT:**  My sentencing.

12          **THE COURT:**  Okay.  You read your Presentence Report?

13          **THE DEFENDANT:**  Yes.

14          **THE COURT:**  You discussed it with one or both of your

15   attorneys?

16          **THE DEFENDANT:**  Yes.

17          **THE COURT:**  And you are satisfied with legal counsel

18   to date?

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  Do you have any questions about what is

21   going to happen today other than what the ultimate sentence is

22   going to be?  Procedurally, do you have any questions?

23          **THE DEFENDANT:**  No, I don't.

24          **THE COURT:**  Okay.  I will tell you the way it's going

25   to work.  I am going to ask, first, both attorneys whether they

Sentencing Hearing
Monday, February 26, 2018

Page 5

1   agree with the calculation of the Presentence Report writer

2   which is in the Presentence Report.  Then I will ask them to

3   basically summarize what their memo said and what ultimately is

4   their final recommendation.  And then it will be your turn.

5   What you say or don't say is very important.  If you don't say

6   anything, that's your right.  You have a Fifth Amendment right

7   to remain silent.  Do you understand that?

8           **THE DEFENDANT:**  Yes.

9           **THE COURT:**  And that includes all these questions I

10  asked.  If you forgot you had the right and you didn't want to

11  answer them, tell me now.

12          **THE DEFENDANT:**  No.  I am happy to answer them.

13          **THE COURT:**  All right.  I'm going to proceed slightly

14  differently this time.  I am going to ask to hear from the

15  forfeiture attorney in terms of -- let's get that done with so

16  you are not mumbling and I am not mumbling as everybody is

17  reacting to the sentence.

18          **MR. ROSS:**  Thank you, your Honor.

19          **THE COURT:**  Please identify yourself again for the

20  record.

21          **MR. ROSS:**  Philip Ross with respect to forfeiture.

22          **THE COURT:**  Go ahead.

23          **MR. ROSS:**  Yes, your Honor.  The parties have entered

24  into a Stipulated Preliminary Order of Forfeiture that follows

25  the forfeiture terms that were included in the defendant's Rule

*16-20636; UNITED STATES OF AMERICA v. Gavin Awerbuch, M.D.*

Page 6

1    11 Plea Agreement in which the defendant agreed to forfeit

2    $4.1 million to the United States.  In return, the Government

3    has agreed to dismiss two civil forfeiture actions that are

4    both pending in front of Judge Ludington.  At such time the

5    defendant completes his payment of the $4.1 million to the

6    United States, the Government is going to recommend and has

7    actually made a preliminary recommendation to the United States

8    Justice Department in Washington to remit $3.1 million which is

9    effectively the amount of restitution this Court is going to

10   order against the defendant according to the Rule 11 Agreement

11   or I am going to ask the Justice Department apply $3.1 million

12   of the 4.1 million that he forfeits to his restitution.  He

13   will have a $1 million forfeiture on top of affectively the

14   $3.1 million forfeiture and restitution that will be completed.

15           **THE COURT:**  The copy that was just handed to me

16   called Stipulated Preliminary Order of Forfeiture is not signed

17   by defense counsel or the defendant.  Is there another copy?

18           **MR. ROSS:**  Your Honor, I'm holding the signed copy

19   and I believe your clerk would prefer that I submit the signed

20   copy electronically when I return to my office.

21           **THE COURT:**  Okay.  Do you want to include my

22   signature on that or I can sign this one?

23           **MR. NEAL:**  We would ask that the Court sign the copy

24   after we submit it electronically to your Honor unless your

25   clerk has a different --

Page 7

1          **THE COURT:**  That's fine.

2          **MR. ROSS:**  Mr. Kriger, I believe that concludes -- I

3    should say that the Government would request that the

4    forfeiture language be included in the Judgment and we will

5    provide that language to the Probation Department for

6    preparation in the Judgment.  Mr. Kriger, I believe that

7    concludes the terms of the forfeiture agreement.

8          **MR. KRIGER:**  That's correct, your Honor.

9          **THE COURT:**  Okay.  And you attest that you already

10   signed it and your client signed the copy that the Prosecutor

11   has?

12         **MR. KRIGER:**  Yes.

13         **THE COURT:**  All right.  You're done.  Thank you.

14         **MR. ROSS:**  All right.  Thank you, your Honor.

15         **THE COURT:**  All right.  Just to review, it's my

16   understanding that the amount of money attributable to the

17   defendant has been repaid.  Is that correct, Mr. Kriger?

18         **MR. KRIGER:**  I'm sorry?

19         **THE COURT:**  The amount of money, his share of the

20   conspiracy, while he might be technically liable for the total

21   amount of the conspiracy, these monies, and as I understand

22   they are represented by a coin collection and the house?

23         **MR. KRIGER:**  It's not a conspiracy, your Honor.  It's

24   just he is the only defendant on the forfeiture.  But we have

25   at this stage in my client trust account we have over a million

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 8

1   dollars.  We hoped to have it all paid by today but I have been

2   in constant contact with Mr. Ross and we anticipate certainly

3   no later than October and hopefully by June the entire amount

4   will be paid.  The coin collection is the main asset that we

5   are using to pay and it's being -- there is --

6           **THE COURT:**  I don't need to need all of the details.

7           **MR. KRIGER:**  He has been selling it as time goes on.

8           **THE COURT:**  And it's guaranteed the proceeds from

9   those sales will continue to go to the forfeiture.

10          **MR. KRIGER:**  That's correct.

11          **THE COURT:**  And my only question is, why do you have

12  money in your trust account that could be given to the

13  Government to reimburse?

14          **MR. ROSS:**  Your Honor, if I may answer that.

15  Mr. Kriger and I will be submitting today or tomorrow a

16  stipulation asking this Court to order the United States

17  Marshal to accept that $1 million or approximately $1 million.

18  The marshals need an Order from the Court before they are

19  permitted to accept the million dollars.

20          **THE COURT:**  Anyone in the audience want to accept the

21  million dollars?  Okay.  That sounds fair enough.  And I can

22  wait a day to sign that Order.

23          **MR. ROSS:**  Thank you, Judge.

24          **THE COURT:**  But I don't expect it to get that big

25  again, the trust account.  Can the Order say that any and all

*16-20636; UNITED STATES OF AMERICA v. Gavin Awerbuch, M.D.*

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 9

1    proceeds as they come in can be accepted by the marshal?

2            **MR. KRIGER:**  We can do that but the way it's been

3    working is the fella who is responsible for the sale of the

4    coins has just been wiring the money.  As soon as I get it I

5    let Mr. Ross know that I have gotten this money and I can remit

6    it virtually the next day.

7            **MR. ROSS:**  I think the marshals actually are going TO

8    require an Order each time with the specific amount.  So

9    perhaps each time Mr. Kriger receives a wire he can contact me

10   and I will prepare the stipulation so that that money is

11   directly sent to the United States Marshal.

12           **THE COURT:**  Thank you.

13           **MR. ROSS:**  Thank you, Judge.

14           **MR. KRIGER:**  Plus the State Bar gets the interest on

15   it.

16           **THE COURT:**  Interest on business accounts are now

17   .01 percent.  I bet you everybody in the audience knew that as

18   well as everyone at the Bar.

19      All right.  Let me look at the Presentence Report and my

20   notes.  All right.  The Presentence Report conclusions as to

21   guidelines, and for those if the audience, guidelines are

22   exactly what they say they are.  They are guidelines that help

23   the Judge i.e., me, to come to a conclusion as to an

24   appropriate sentence.  And they came out to Category One which

25   reflects this is the defendant's first felony conviction.  And

Page 10

1    a level 27 which reflects a number of factors including the

2    amount of money involved, the length of time that the defendant

3    was involved in this fraud, the seriousness of the offense

4    charged and a lot of other variables.  And it came out to level

5    27.  And there is a table, a reference table that says when you

6    have Level 27 and Category One, the guideline range is 70

7    months which is a little bit less than six years to 87 months

8    which is three months longer than seven years.

9        And the courts tell me that this is a starting place to

10   then apply what are called the congressional factors which I

11   will go through at length in a few minutes.  But before I do

12   that I want to hear from the Government as to, do you agree

13   with the calculation?

14           **MR. NEAL:**  I do, your Honor.

15           **THE COURT:**  Defense?

16           **MR. KRIGER:**  I do, your Honor.

17           **THE COURT:**  Okay.  So we are all starting at the same

18   place.  It used to be easier for the Judge when the guidelines

19   are almost mandatory because it limited my discretion to, in

20   this case, it would have been about a year and a half window.

21   However, while it is a calculation and it made it hard to

22   depart from it, it didn't make me sleep better at night because

23   any formulation for sentencing is going to result in the

24   exercise of discretion at all different levels.  And when you

25   have discretion like a Judge has or the Prosecutor and the

Sentencing Hearing
Monday, February 26, 2018

Page 11

1   investigating officers have when they are investigating the
2   case and bringing the charges or the defense attorney has when
3   they are negotiating as in this case, a plea, it means there is
4   some arbitrariness to it.  There is no correct or right answer.
5        And then when it gets to the Judge, the Judge has the same
6   kind of discretion.  And ultimately I have to decide.  And it
7   makes it harder for me to figure on the correct or what I think
8   is the right sentence.  And then the old system -- but I sleep
9   better at night because I made an effort to fit the crime, the
10  participation of the defendant, the background of the defendant
11  and all the variables I will be talking about in a couple of
12  minutes.  And nobody tells us or gives us any guidance on which
13  factor is more important.
14       And the reason you get different sentences for different
15  people, there are several reasons.  One is everybody is
16  different in their involvement in crime and the nature of the
17  crime.  And, two, every Judge is different in terms of our
18  backgrounds.  And therefore we come at it differently.  And the
19  alternative would be to go back, not only having almost
20  mandatory guidelines but make them mandatory and the problem
21  with that is not everybody is the same and variables are too
22  many and what you would be doing is replacing Judges at all the
23  other levels with robots.  And it could save money, but it
24  would cause all sorts of unfairness and inequity.  So that is a
25  preview of what I have to do.

Page 12

 1       I want to hear from the Government as to what your

 2   recommendation is and why and just summarize your Sentencing

 3   Memorandum if you will.

 4            **MR. NEAL:**  Certainly, your Honor.  As a starting

 5   place I would like to make a motion pursuant to Section 5K1.1

 6   of the United States Sentencing Guidelines.  That is a motion

 7   for a downward departure based on Defendant Awerbuch's

 8   cooperation.  The cooperation was spelled out in the Sentencing

 9   Memorandum.  This is cooperation that involves a physician who

10   is named in the sealed Sentencing Memorandum here in Detroit

11   that Doctor Awerbuch has cooperated against.  So that is where

12   I will begin.  I am asking for a below guideline sentence based

13   on that cooperation.

14       The sentence that we are recommending is one of 52 months

15   incarceration.  And we came to that number after evaluating a

16   number of the most pertinent of the congressional factors that

17   you referenced earlier.

18       Starting with the nature and circumstances of the offense.

19   Your Honor, the nature and circumstances of the offense here

20   are extremely serious.  Doctor Awerbuch received financial

21   benefits from a drug manufacturer that made a particularly

22   powerful opiate painkiller known as Subsys and Doctor Awerbuch

23   prescribed Subsys at a rate that was truly staggering during

24   the period from approximately January of 2013 through his

25   arrest in May of 2014.  Doctor Awerbuch prescribed some

Page 13

1    $6.9 million worth of that drug to Medicare beneficiaries.

2    That was far and away the leading -- strike that.  Doctor

3    Awerbuch's prescriptions to Medicare beneficiaries for this

4    drug represented approximately 20 percent of the total Subsys

5    prescriptions for Medicare beneficiaries during that time

6    frame. He was far and away the leading physician in the country

7    for writing prescriptions for that drug during that time frame.

8         **THE COURT:**  What was the time frame?

9         **MR. NEAL:**  From approximately January of 2013 through

10   his arrest in May of 2014.  Doctor Awerbuch was also involved

11   in a separate fraud scheme during the same time period and that

12   fraud scheme dated back much earlier, from approximately 2009

13   through his arrest in May of 2014.  Doctor Awerbuch was engaged

14   in a scheme to bill Medicare and other insurers for unnecessary

15   needle EMG tests and other nerve conduction tests.  Doctor

16   Awerbuch profited considerably from that practice and in total

17   cost the Medicare and Blue Cross programs over $3 million of

18   medically unnecessary tests associated with nerve reduction

19   studies.  So I think by any account, the nature and

20   circumstances of the offense here are quite serious.

21        Another of the congressional factors is the history and

22   characteristics of the offender.  And the Government laid this

23   out in our Sentencing Memorandum.  But I think the history and

24   characteristics of the offender are quite mixed.  There are

25   some aspects of Doctor Awerbuch's history and characteristics

Page 14

1  which go to his credit.  Doctor Awerbuch has a loving and

2  supportive family.  You saw a number of the letters that were

3  submitted by patients that worked with Doctor Awerbuch and many

4  of those letters were glowing about the care they received from

5  Doctor Awerbuch over the years.  Clearly this is a man who has

6  done good in his personal and professional life.

7      By the same token, there is -- there are aspects of Doctor

8  Awerbuch's history and characteristics that are much less

9  attractive.  Doctor Awerbuch did not need to do this.  Doctor

10  Awerbuch had a successful practice.  Doctor Awerbuch had a

11  successful life.  Doctor Awerbuch was already a wealthy and

12  prominent physician.  There was absolutely no need for Doctor

13  Awerbuch to accept kickbacks from the drug manufacturer in

14  order to prescribe a drug on occasion unnecessarily.  Doctor

15  Awerbuch did not need to engage in fraudulent needle EMG and

16  another nerve conduction studies in order to profit himself.

17  Doctor Awerbuch was already a wealthy man and his greed caused

18  him to commit crime to become even wealthier.

19          **THE COURT:**  Did the people who gave the kickbacks,

20  are they being prosecuted?

21          **MR. NEAL:**  There is a prosecution in the District of

22  Massachusetts involving a number of executives from that

23  company that is ongoing.  I believe that is scheduled for trial

24  in January of 2019.

25          **THE COURT:**  Including the owner?

Page 15

1      **MR. NEAL:**  Judge, I am not familiar with all the

2   details of that prosecution.  But I know it exists.

3      **THE COURT:**  It is a first that I have been made aware

4   of in my 20 years here of truly in the drug oversupply,

5   overbilling Medicare Medicaid fraud area where they have gone

6   after the other people who are equally greedy and probably

7   should know better than even a doctor in terms of the side

8   effects of opioids.  And I am pleased to hear that -- doubly

9   pleased because it's not my case, that it has been prosecuted

10  in Boston for the people who were involved. This defendant

11  should have known better.  They should have known more better

12  if there is such a phrase.  And continue.

13      **MR. NEAL:**  Judge, another of the congressional

14  factors is the need to provide just punishment for the offense.

15  And the Government laid this out in our Sentencing Memo.  This

16  is an offense that should carry a significant period of

17  incarceration with it.  Subsys is a very powerful Fentanyl

18  spray, a very powerful opioid.  In fact, the risk of abuse of

19  this drug is so significant that before prescribers can

20  prescribe the drug they have to enter a special program that is

21  run by the Food and Drug Administration and that requires all

22  manner of provider education about the seriousness and the

23  risks associated with this drug.

24      Doctor Awerbuch enrolled in that program.  Doctor Awerbuch

25  was aware of the significant risks associated with this drug,

Page 16

1   yet he still prescribed it unnecessarily for money.  And that

2   is a very serious offense.  That is an offense that I think in

3   order to -- in order for justice to be done this is an offense

4   that should carry a very significant penal consequence and that

5   is what the Government is asking for here.

6        Finally, the last factor we focused on was the need for

7   deterrence, both general and specific.  As we laid out in the

8   memo, I don't believe that specific deterrence is a great

9   important consideration here.  Doctor Awerbuch will no longer

10  be practicing medicine.  His opportunity to engage in fraud of

11  this sort will be limited.

12           **THE COURT:**  Does he still have his license?

13       **MR. NEAL:**  It has not been renewed and the plan is

14  to -- for that to be surrendered as soon as sentence is

15  imposed.

16           **THE COURT:**  Is that part of the sentencing Order or

17  is that -- Mr. Kriger, do you know?

18       **MR. KRIGER:**  No, Judge.  Your Honor, he is required

19  by law to notify licensing once he is sentenced that he has

20  been sanctioned.  He did not renew his license which was up for

21  renewal several months ago.  And I plan on notifying the

22  Licensing Board.  He would -- and I am going to speak about

23  this in the future -- like to do voluntary work if he ever gets

24  his license back.  But that is certainly very iffy.

25           **THE COURT:**  Okay.  Continue.

Sentencing Hearing
*Monday, February 26, 2018*

Page 17

1          **MR. NEAL:**  Turning to general deterrence, I think

2     general deterrence is a bigger consideration in fashioning a

3     sentence here. Unfortunately, health care fraud is an epidemic

4     in this jurisdiction as well as nationally.  The fact we have a

5     physician who engaged in this misconduct, $3 million in

6     fraudulent billings, numerous prescriptions for substances that

7     were written without medical necessity, it would send a

8     laudable message to the community if Doctor Awerbuch was given

9     a significant period of incarceration based on the nature and

10    circumstances of his offense.  And that would hopefully deter

11    others from engaging in similar conduct in the future.  I think

12    weighing all these different considerations, the Government

13    submits that a sentence of 52 months incarceration would be

14    appropriate for this offender.

15          **THE COURT:**  Thank you.

16          **MR. KRIGER:**  Your Honor, I would like to speak as my

17    co-counsel would, but I would like to address some issues

18    first.

19         Your Honor, I have gotten to know Doctor Awerbuch really

20    well.  I have been living with Doctor Awerbuch since 2014.  At

21    his core, he is a decent, compassionate human being despite the

22    conduct that has brought him before this Court.

23          **THE COURT:**  Does that make it better or worse for him

24    now?

25          **MR. KRIGER:**  I am hoping it makes it better.

*16-20636; UNITED STATES OF AMERICA v. Gavin Awerbuch, M.D.*

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 18

1      **THE COURT:**  He knew better.

2      **MR. KRIGER:**  Pardon?

3      **THE COURT:**  He knew better.  He was a decent human

4  being.

5      **MR. KRIGER:**  He did know better and he took immediate

6  responsibility for what he did.  Before we had a single page of

7  discovery, a single page discovery, the day he was brought in

8  on the complaint, Mr. Neal came up to me and said we would like

9  his cooperation.  And that day he agreed to do it and met with

10  the agents.

11      **THE COURT:**  He didn't do it the day before he was

12  caught, did he?

13      **MR. KRIGER:**  He did not.

14      **THE COURT:**  Okay.  Go on.

15      **MR. KRIGER:**  Your Honor, we have an audience of --

16  packed, and virtually 70 percent of these people are patients.

17  I trust that the Court had an opportunity as long as it was to

18  read the letters from these patients.

19      **THE COURT:**  I had the opportunity but not the time.

20  I looked at some.  But I believe they were filed about ten days

21  ago.

22      **MR. KRIGER:**  Ten days ago.

23      **THE COURT:**  Yeah.

24      **MR. KRIGER:**  There were literally hundreds of letters

25  from patients that are more remarkable than any letters I have

Page 19

1    had since I have been practicing law.  In addition to the

2    letters from the patients, and I don't know if the Court had an

3    opportunity to read these, we had letters from people where he

4    did volunteer work.  Not volunteer work that he started after

5    he got in trouble, but volunteer work since he has been a young

6    man at Michigan State.  He took care of a quadraplegic, fed

7    him, everyday attended to him.  To a blind student.

8              **THE COURT:**  What is his specialty?

9              **MR. KRIGER:**  He's a neurologist, your Honor.

10             **THE COURT:**  Okay.

11             **MR. KRIGER:**  He then, while he was in medical school,

12   volunteered with the Muscular Dystrophy Society.  Continued

13   that when he was practicing medicine.  He also volunteered at

14   Camp Tamarack, one after another.  He worked for a clinic in

15   Pontiac in 2010 well before he was under the Government's radar

16   where he treated indigents.  He worked in a clinic in Detroit

17   where he treated indigents and then not only did he --

18             **THE COURT:**  What hospital was he associated with?

19             **THE DEFENDANT:**  Up in Saginaw, St. Mary's Hospital in

20   Saginaw General Hospital.

21             **THE COURT:**  Thank you.

22             **MR. KRIGER:**  And then took whatever little he earned

23   because there was some insurance and he donated that to buy

24   school supplies for children, volunteered to coach basketball

25   for the very same children.  He also brought other physicians

Page 20

1   to do volunteer work.

2       I have represented a number of doctors over the years and

3   I have never, save maybe one case, seen the testimonials that I

4   have seen in this case.  And there was -- when he was arrested

5   on the Complaint, his patients actually held a vigil in support

6   of him.  And, again, most of the people that are here today are

7   his former patients.

8       He has certainly much to be ashamed of but he has much to

9   be proud of.  The substance that was prescribed which he takes

10  full responsibility for, was given to us in 2 percent of his

11  patients.  The EMGs, I think the volume of EMGs is a bit

12  misleading because he also did EMGs and read other EMGs for

13  other doctors and that is what caused the large amount of

14  billings.

15      One of the things that I did, your Honor, was, and I think

16  this is an important consideration in determining the

17  appropriate sentence, is similar sentences, sentences for

18  people similarly situated.  And I hired a company, MCM Data who

19  did an analysis of everyone whose guidelines were based both on

20  drug offenses and health care fraud.  Doctor Awerbuch had a 27

21  month, I'm sorry, 27 level increase if his guidelines for the

22  drug offense.  There were 18 defendants with that 28 level.

23  There was nobody with 27.  The average sentence was 4.5 months,

24  and this is with a 5K for cooperation, and the median was

25  probation.  There was one defendant that actually had a 27

Sentencing Hearing
Monday, February 26, 2018

Page 21

1    Offense Level increase for both guidelines based on health care

2    fraud and on controlled substances and that person got 27

3    months with a 5K.  There was one defendant that had a 26

4    Offense Level increase and that person got one day.  And there

5    were 17 defendants that had a 25 -- had a level 25 Offense

6    Level and that average was 4.1 months and a median of

7    probation.

8              THE COURT:  What pool of people were you looking at?

9         MR. KRIGER:  Nationwide.

10             THE COURT:  Okay.

11             MR. KRIGER:  Nationwide.  So how did I arrive at 20

12   months?  That sentence that I requested is significantly over

13   what the national median and average is for admittedly a small

14   sample, but considerably more.

15        One of the things that I think is important to talk about

16   here is the 5K.  It is not unusual in this district to have a

17   requested decrease of 40 to 50 percent based on cooperation in

18   a single case.  That's not what is happening here.  We have a

19   25 -- we have a 25 percent reduction request which would put

20   him down to 52 months.  But the fact that he may get one down

21   the road in any other case is really irrelevant to what this

22   Court should sentence him today because the Sixth Circuit has

23   said that can't be considered.

24             THE COURT:  I missed that point.  What potential for

25   sentencing down the road?

Page 22

1          **MR. KRIGER:**  If another Rule 35 is filed, if a Rule

2     35 Motion is filed down the road, the Court cannot consider

3     that in determining what the sentence ought to be today because

4     there is no guarantees.

5               **THE COURT:**  That makes sense, doesn't it?

6          **MR. KRIGER:**  Yes, it makes complete sense.  So what I

7     am saying is it certainly is not unusual in this district for a

8     40 to 50 percent decrease from the guideline range

9     recommendation --

10              **THE COURT:**  We have some transcript showing that a

11    Judge actually said that?

12              **MR. KRIGER:**  No.

13              **THE COURT:**  Forty to fifty percent because he might

14    get a Rule 35?  I have never seen a Rule 35 after a 5K1.

15              **MR. KRIGER:**  No.  I understand that.  But the

16    point -- and I have seen it in one case in 37 years.  But the

17    point that I am trying make here is that if the Court was --

18    the Government typically grants 40 to 50 percent.  It's not

19    unusual in a case where a defendant cooperates in a single

20    case.

21              **THE COURT:**  Let me stop.  Does the Government agree

22    with that proposition?  Is it usually 40 to to 50 percent?

23              **MR. NEAL:**  The Government's position is that the

24    appropriate reduction for Doctor Awerbuch is a 25 percent

25    reduction.

Sentencing Hearing
Monday, February 26, 2018

Page 23

1          **THE COURT:**  I understand that.

2          **MR. NEAL:**  Doctor Awerbuch with respect to that

3   cooperation which is laid out in a little bit more detail --

4          **THE COURT:**  I'm not asking that question.  I am not

5   asking you how you exercised your discretion.  I am asking, is

6   the factual proposition that Mr. Kriger said, that the usual --

7   first of all, is there a usual 5K1 or is it very much dependent

8   on the variables that I mentioned including the variable of the

9   officer-in-charge and the Prosecutor --

10         **MR. NEAL:**  I think there is a great deal of variation

11  in what the Government recommends based on a number of factors.

12         **THE COURT:**  Go on.

13         **MR. KRIGER:**  It certainly has been my experience,

14  your Honor, where cooperation helps resulting in a guilty plea

15  that 40 percent is not unusual.

16         **THE COURT:**  Okay.

17         **MR. KRIGER:**  And it's been my experience that where

18  the Government makes a 40 percent that it's not infrequent for

19  the Court to go below that recommendation.  What I think is

20  important in this case, your Honor, is when you look at the

21  individual characteristics of the defendant, I don't think you

22  could find a case or a defendant that has done more for the

23  community and more for his patients despite the conduct that

24  brought him before the Court that Doctor Awerbuch has done in

25  his lifetime.  And these letters -- and it's not hyperbole to

Page 24

1    say are remarkable, just remarkable.

2          **THE COURT:**  Mr. Kriger, one of the reasons I was not

3    concerned about reading each and every letter is because I knew

4    your summary would highlight and emphasize the nature and the

5    quantity of the letters.  And I certainly don't expect

6    receiving a packet of letters that would include anything

7    negative.  So I am taking it as true all of the glowing

8    memorials that are contained in the letters so that you don't

9    have to emphasize that.

10         **MR. KRIGER:**  Patients called me to ask if they are

11   allowed to speak on his behalf and I said we wrote letters and

12   I don't think it's necessary --

13         **THE COURT:**  Please listen, Mr. Kriger.  You don't

14   have to emphasize that.  I am taking you at your word.  You

15   already said that two or three times.  And I see the evidence

16   of it sitting in the courtroom.

17         **MR. KRIGER:**  Thank you, Judge.  So, in conclusion, I

18   guess, your Honor, what I would like to say is that I gave you

19   some statistics for similarly situated people, albeit a small

20   example, but that's what it is nationwide from 2012 through

21   2016.  And the sentence that I requested in this case is far in

22   excess of what those defendants received.  And I find it hard

23   to believe, although I have no personal knowledge, that they

24   have done more in their lifetime than what Doctor Awerbuch has

25   done for his patients and for the community in terms of

Sentencing Hearing
Monday, February 26, 2018

Page 25

1  charitable work and community service.  What he did was clearly

2  wrong.  And he understands it.  And from day one came forward

3  and took responsibility for his actions.  And I think it is

4  laudable.  And I think the sentence I requested is not in any

5  way out of line given the history and characteristics of the

6  defendant.

7        This case is all, at least in My mind, somewhat about

8  deterrence but really about punishment.  And 20 months is not

9  an insignificant sentence.  And Mr. Brenner is going to say a

10 few words because he knows Doctor Awerbuch.  But also the story

11 of his one son is truly remarkable.

12            **THE COURT:**  Mr. Brenner?

13          **MR. BRENNER:**  Hello, your Honor.  I practiced 46

14 years.  My first big case was in this courtroom in 1973.  So

15 words come easy to me.  Also because I love Gavin so dearly

16 tears come easily to me.  So you have to forgive me if I get

17 too emotional.

18       I accept what Mr. Neal has to say about the dark aspects

19 of Gavin's practice.  But I would like to turn from the dark

20 aspects to the bright practice, those things that go beyond the

21 letters and to a kind of analytical assessment of who Gavin

22 really is.  And doing so, I'm going to mention in passing

23 because it's not about me, that even though I practiced for 46

24 years, I spent 40 years in academic medicine and so I would

25 like to begin on a less emotional, less emotional --

Page 26

1          **THE COURT:**   What is academic medicine?

2          **MR. BRENNER:**   Because I think there are three things

3    I found –– there are three things I found.  I talked to Gavin

4    constantly.  We are like brother.  Even though we are first

5    cousins we grew up in the same block.  Interpreting the

6    underlying rationale for the patients' letters, not just what

7    they had to say, three factors played an important part.  I

8    would like to relate those three factors to Gavin's life and I

9    would like to relate those three factors to some of the family

10   issues that I think shows his dedication.

11         Those three factors that I find in Gavin over the years as

12   a physician on the bright side is that he has one of the

13   deepest clinical knowledge bases of any physician I have ever

14   known.  And that relates to a second factor.  There was a book,

15   House Of God, that talked about vernacular and nomenclature

16   that physicians use outside the presence of patients and those

17   experienced in medicine.  There is an expression called a

18   caboose.  A caboose is a physician who is willing to treat

19   patients that no one else will, not because they have emotional

20   problems or because they complain, but because of their

21   complexity.  And in all of the conversations, because patients

22   would call me, the one thing about Gavin where this clinical

23   knowledge base was so important is he was one of the few

24   physicians willing to treat patients that other physicians

25   thought were absolutely hopeless.  In fact, you will note in

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 27

1  the memo that one patient referred going to the Mayo Clinic.

2  Scott and White (ph) in Temple, Texas which is one of the great

3  clinics in this country and I think she even went to the

4  Geisinger Clinic and only fund an answer with Gavin.  So that

5  meant that Gavin had to look at the medical literature.  He had

6  to study.  This wasn't your cholesterol is too high, your blood

7  pressure is too high, your sugar is too high. They were putting

8  the pieces together.  So let me just give you a little glimpse

9  of what Gavin's life was like because it both speaks to his

10  family commitment and to his patients' commitment.

11       Gavin's family lived in metropolitan Detroit.  Here today

12  is my cousin, Eric, Gavin's son.  My cousin, Adam, is in

13  medical school.  Amy, his life partner, is here.  Their family

14  was in Detroit.  So Gavin, out of devotion to his family,

15  decided to live in Detroit.  And I knew his chairman of

16  neurology at Wayne State when he was doing his fellowship and

17  he had many opportunities in this area but he chose Bay City

18  because it's an underserved area in Michigan where there was no

19  neurologist.  So he had this sort of combined commitment to his

20  family and to Bay City which meant he drove three hours every

21  day to get to work.  He would wake up at 4:15 in the morning.

22  He would get to work.  He would use the medical literature.  He

23  would review all those things related to the patients'

24  conditions.  He would see 40 or 50 patients a day and he would

25  come home.

Page 28

1    So there was, despite the darkness, this extraordinary

2   commitment to be the one doctor of last resort.  And these were

3   all nice people.  I talked to so many because I knew of his

4   cousin and I jokingly said for two months I would say that

5   people have a blessed day.  These were farmers, people who

6   worked at General Motors, and they would always say thank you

7   so much.  I love Doctor Awerbuch.  Have a blessed day.

8       And that kind of brings me to which is what is the most

9   difficult aspect which is Gavin as a family member.  And the

10  starting point that is the most difficult is that Gavin had a

11  child, Drew, out of wedlock.  Drew's mother shot her own

12  mother.  She tried to murder Gavin.  She was sentenced to ten

13  years in prison.  And Gavin understood that it was important to

14  the mental health and development of Drew that Drew have a

15  relationship with his mother.

16      And I had occasion to go to prison with Gavin and Drew and

17  I recall one time that we went to prison and although Gavin's

18  principal purpose was to make sure that Drew loved his mother,

19  that he loved his grandmother, his aunts and uncles, but that

20  particular day Drew just really didn't want to go.  And I

21  remember Gavin telling Drew how much it meant to his mother who

22  was incarcerated to experience his love once a month.

23      And I represented a lot of custody cases in my days in

24  legal services.  But here is a woman who tried to murder him.

25  And yet Gavin had the compassion to see in her something good.

1  He never said anything bad about Terry.  He always encouraged

2  Drew to love her.  My personal experience was that when Drew

3  was a young baby, I couldn't get near him.  No one could get

4  near him.  Drew was so disturbed that only Gavin could change

5  his diapers.  Only Gavin could hold him.  And as it evolved,

6  one of the most joyous moments in my life is that I would walk

7  into Gavin's house as Drew developed and I have an

8  over-developed need be loved.  And Drew would run into my arms

9  and play with me and love me as a cousin.  And his mental

10 development was all because of the extraordinary ability to

11 look beyond this murder attempt to the humanity both in Terry

12 and to the need of his son to have this relationship.  And that

13 sort of extraordinary kind of humanity affected every aspect of

14 our family life.

15      Judge, it would be too emotional for me to talk about it.

16 But my father and my sister died next to each other.  I live in

17 North Carolina.  My parents had two grave sites next to each

18 other.  The plot -- buried my father in North Carolina where I

19 could visit him.  I did.  My sister, therefore, I wanted to

20 bury in the plot next to my mother.  Gavin was there for me

21 every moment.  Sat Shiva at his house.  Every single member who

22 touched Gavin's life has a story like that.

23      His Uncle Morris was dying of cancer.  Everyday Gavin

24 would go and read to him.  And the most important part is

25 Jerry, his father, was more important to me than anyone other

1   than my parents who dearly loved me.  And Jerry developed

2   dementia.  And after all of these hours at work, 40 or 50

3   patients a day, at night sometimes I would go with Gavin when I

4   was visiting and he spent this time doing everything for his

5   father.  I remember his father was having difficulty eating and

6   he prescribed Remeron (ph), an anti-depressant, to increase

7   appetite.  He was low in energy and he prescribed testosterone.

8   And although Jerry had dementia, because I went further back

9   with Jerry than anybody who was alive, he had my number and we

10  would call and I would call Jerry and, yes, you know, he would

11  repeat things over and over and over, but somehow I was the

12  only one who could connect with Jerry because with dementia you

13  have long time memory.  So we would joke about all those things

14  I did as a child.  But the one thing that Jerry said over and

15  over and over again, you know, I am okay because Gavin is

16  taking care of me.

17       And I am going end on something that Mark didn't think was

18  a very good idea but it's important to me and I ask for an

19  exemption from the Court if you think it's inappropriate

20  because my love for Gavin is so decent.  Our grandfather was a

21  man of meager means.  He had a chicken and fish store in the

22  inner city.  When he died, you couldn't get into the funeral.

23  All my life I kept on hearing grandpa was the kindest man

24  anyone knew.  And I will tell you from my heart that the

25  kindest person I have known in my life is my beloved cousin

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 31

1  Gavin.  And I know he has committed criminal offenses and human

2  nature is complex, and I ask your Honor to consider that the

3  world in many ways is so bright and beautiful and I know that

4  this audience and all of the family would say the same thing.

5  Gavin Awerbuch is the kindest person we have all known.  And I

6  apologize for his criminal conduct and ask that you consider

7  that in fashioning a sentence that is fair and just because I

8  love him so dearly.  Thank you.

9       **THE COURT:**  Thank you.  Do have you anything to say

10  on your own behalf?

11       **THE DEFENDANT:**  Yes, your Honor, I do.  I am a little

12  nervous so I am going to read from my notes.

13       **THE COURT:**  That's perfectly okay.

14       **THE DEFENDANT:**  Thank you for the opportunity to

15  address the Court.

16       **THE COURT:**  Please use the microphone.

17       **THE DEFENDANT:**  Thank you for this opportunity.  It's

18  simply impossible to put into words how sorry I am and how much

19  I regret the conduct that brought me here today.  And I have

20  written a letter and there are letters of support from others

21  who detailed how ashamed I am for what I have done.  I have

22  hurt so many people and have taken advantage of the health care

23  system that is overburdened and depends on doctors in being

24  honest when billing and prescribing pain medicine.

25       I do understand that prescribing Subsys put those patients

Page 32

1   at risk.  I tried to make amends by agreeing to painful

2   restitution and forfeiting additional money that I received due

3   to my conduct and also by agreeing to testify against –– and to

4   testify.  I want to apologize to my patients who depend on me

5   for their care.  I still get calls from many of my patients

6   telling me that he have been unable find a doctor to replace me

7   or they will call me asking for medical advice.  And I feel

8   very guilty about the fact that my conduct has resulted in some

9   of those patients not getting the adequate medical care they

10  truly need.

11      My office and home were initially raided by the FBI in

12  2011 and then they were raided again in 2013.  Amy was at home

13  during the raids.  And this investigation and the case against

14  me has caused her and my family a great amount of emotional

15  stress.  And I want to apologize to my family for the stress

16  that I caused them.

17      I also want to apologize to my former employees.  Many

18  have not been able to find jobs and have having financial

19  burdens.  Not only were my assets frozen but all the retirement

20  accounts were frozen which included retirement benefits of the

21  employees.  I have been told that once my forfeiture is paid

22  off the employees will get their benefits.  But many of them

23  have struggled and I feel really bad about that.

24      My conduct has also resulted in the loss of my medical

25  license which has prevented me from continuing in my life's

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 33

 1    passion of working as a physician.  To help me determine the

 2    reasons for my actions, I've worked with a psychologist and

 3    psychiatrist to better understand my character flaws and I made

 4    great strides with therapy to assure myself that I will never

 5    act in this manner again.

 6        I am now looking towards the future.  I am hoping that you

 7    can see the good in me and not judge me by my actions alone in

 8    this case.  I am almost 60 years old and will hopefully have

 9    many years ahead of me after completing my sentence.  I would

10    like to continue with charitable and volunteer work which has

11    been another of my life's passions.  The concept of giving back

12    has been instilled in me both by my parents and grandparents

13    and it's been a part of my life since I was a child.  If I am

14    ever able to obtain my medical license again and work as a

15    physician again, I would like nothing for than once again

16    provide free care to indigent patients.  This was extremely

17    rewarding to me and hopefully I will be able to continue once

18    again.

19        I also would like to continue teaching and mentoring

20    medical students.  I am certified in addiction medicine, would

21    like to counsel people with addictions.  Amy and I always

22    planned on doing medical missions after retirement and we would

23    like to somehow get involved in that.  And I hope that goal

24    will still be attainable.

25        I would also like to speak to medical groups and let

*16-20636; UNITED STATES OF AMERICA v. Gavin Awerbuch, M.D.*

Page 34

1   doctors know what can happen in they engage in fraud and if

2   they prescribe unnecessary pain medications and how the

3   consequences will not only prevent them from practicing their

4   profession but the way it affects so many others like their

5   families and patients.  I am also looking forward to spending

6   time with my children and grandchildren. I hope I can be an

7   inspiration and share my love for charitable work and

8   volunteerism and instill in them the importance of giving back

9   to society.  Thank you.

10          **THE COURT:**  Anybody else have anything to say?

11   Government?  Defense lawyers?

12          **MR. NEAL:**  Nothing from the Government, your Honor.

13          **MR. KRIGER:**  The only thing I forgot to mention, your

14   Honor, is he never turned down a patient that didn't have money

15   ever.  And the employees all attested to that.

16          **THE COURT:**  All right.  Are we ready?  Ready, Doctor?

17          **THE DEFENDANT:**  Yes, your Honor.

18          **THE COURT:**  All right.  Some of this is scripted and

19   some of it -- most of it is not.  The beginning is where I

20   summarize the guidelines and the congressional factors. The

21   rest has a portion that is scripted.  We have all agreed what

22   the guideline range is.  And, by the way, I should grant the

23   5K1 motion.  I assume, Mr. Kriger, you have no objection.

24          **MR. KRIGER:**  No objection, your Honor.

25          **THE COURT:**  All right.  So the guideline range before

Page 35

1    the 5K1 is 70 to 87 months.  And with the 5K1 the guidelines

2    become even more advisory so that almost anything I give below

3    the guilty plea agreed to amount, the Government can't appeal

4    because they have made and exercised their discretion to give

5    value to the cooperation that you provided.  But I am not bound

6    by whatever percentage they used to evaluate that.  That is my

7    call.  And that is, of course, an important factor as are the

8    guidelines.

9        So I start with the guidelines and it's 70 to 87 months.

10   And then I factor in the 5K1 over here to the side.  It's in my

11   mind.  And I have in my hand a list of the congressional

12   factors that I am to consider, some of which are pretty obvious

13   and some of them are less so.

14       The goal of federal sentencing now after I have been given

15   more discretion is to impose a sentence sufficient but not

16   greater than necessary.  Sounds good, but it leaves a lot of

17   discretion to me.  And the source of that quote is the Supreme

18   Court decision from 2007 called Kimbrough, K-i-m-b-r-o-u-g-h.

19       And the first factor is the seriousness of the offense.

20   And there are two Counts here.  And one Count is a 20 year

21   felony and the other Count is a ten year felony.  Just using

22   the word felony tells me it's a serious offense.  Twenty years

23   is near the top of the range of felonies and ten years is

24   closer to the middle.  Both are substantial felonies and that

25   is a factor that I consider.

Sentencing Hearing
Monday, February 26, 2018

Page 36

1        Now, in terms of general deterrence, that is, will the

2   sentence that I impose deter other people?  And I have trouble

3   relying on what I do as being a deterrent because this showing

4   up of a number of people for the sentencing is rare.  It's not

5   unusual.  It's rare and it's welcomed.  But you are not the

6   people who have to be deterred.  The people who have to be

7   deterred in this kind of case are primarily people in the

8   medical field or who can work with people in the medical field

9   to both distribute drugs and defraud Medicare.  So the

10  potential bad doctors are going to be more deterred in this

11  case by the work of the federal agents and the United States

12  Attorney's office.  That is, if somebody is contemplating doing

13  this and they know that a colleague or another doctor has been

14  caught, that is much more likely to deter them, especially when

15  we are talking about what is predominantly an economic crime.

16  And the word greedy has been used.  Not only has Doctor

17  Awerbuch been greedy.  Self admitted.  It's obvious.  And

18  anyone who wants to do this kind of crime and has the

19  qualifications is almost, by definition, well paid to start out

20  with.  And there is no reason -- it's not a survival thing.

21  It's a greed thing to get involved.

22        So in terms of general deterrence, little that I say here

23  will deter other people.  But the case has had some deterrent

24  effect before it got to this level.

25        In terms of special deterrence, it's hard for me to place

Page 37

1    myself in a situation where a man has done so much for free

2    helping people without money or limited means and at the same

3    time has a decent income from legitimate purposes, practicing

4    his profession associated with a hospital, St. Mary's in

5    Saginaw.  And so this extracurricular criminal activity was not

6    a function of need but more a function of want.  And that

7    obviously doesn't help you in my rationalization.  But it

8    puzzles me because you are apologizing which is usually a

9    symptom of taking responsibility.  The guidelines gave you

10   credit for taking responsibility.  But you didn't need to do

11   this.

12        And so in terms of deterring you, there has to be an

13   element of punishment involved to remind you that it's not a

14   zero sum game where if you get caught you give back the money

15   because that would make it into Las Vegas and we don't want

16   that.

17        In terms of dangerousness, obviously, you are not

18   dangerous to any individual as attested by all of the people

19   who came here who said you were the opposite of being

20   dangerous.  You are dangerous to the system but that's taken

21   into account because of the severity of the felony statutes.

22        And in terms of disparity, your attorney has done a good a

23   job as can be done to try and show a pool of people who are

24   similarly situated.  And as I have said two or three times

25   today, there is no such pool.  There is a pool of people who

Page 38

1   have been convicted of one or both of these crimes, but their

2   backgrounds are all different.  Their motivations are

3   different.  And, again, if there were such a pool and it could

4   be mathematically calculated, I wouldn't be struggling with the

5   discretion I have.  And, at this point, I am still not sure

6   exactly what sentence I am going to impose but it is going to

7   be prison time and it's going to be somewhere probably between

8   the 20 months and the 52 months.  And as I'm explaining to you

9   I am also thinking to myself how much time would be

10  appropriate.  So the disparity argument in this case doesn't

11  hurt you.  It doesn't really help you.

12       Care and treatment.  You mentioned something and I am

13  going to mention it now.  One of the factors is that whatever

14  time you spend in prison, they should make available to you

15  mental health counseling and treatment.  You already referred

16  to the problems you are having and are wise enough to have

17  sought professional advice and I want that to continue.

18       And I already talked about your prior record in the sense

19  that you have no prior criminal record and in the sense that

20  while your attorney would say, and this is acknowledged by the

21  prosecution, you have done some extraordinarily positive things

22  which is all part of your record.  But as I have indicated,

23  that tells me that you should have known better than to do

24  this.  This is the opposite of doing positive things.

25       Your work record is obviously good because that included

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 39

1    your volunteer work.  But, again, it's contradicted by what you

2    did as a professional in this case and what you pled guilty to.

3        Your attitude I already discussed.  I would like to think

4    and I would bet because of your age and trauma that you have

5    endured and have inflicted on your loved one's family and

6    patients that you will not participate in something like this

7    again.  And it becomes even less likely that you will because I

8    would anticipate you are not going to get your license back and

9    if you do get it back, it will be on very severe supervision.

10       In terms of your financial condition, I already mentioned

11   the fact that you are doing restitution and contributing to

12   payment for the loss and more, obviously helps you. Again, it

13   is not a situation you can buy yourself out of.

14       And as far as I can tell from the Presentence Report, your

15   health, other than your mental health, is good.  And your

16   mental health is not at, again, according to the Presentence

17   Report, at a danger level.  You are not severely depressed and

18   so on.  But that will all be evaluated when you are in prison.

19   And I am taking into consideration your age.  And I am ready to

20   impose sentence if you are ready.

21            **THE DEFENDANT:**  Yes, your Honor.

22            **THE COURT:**  As to Counts One and Two of the

23   Information, pursuant to the Sentencing Reform Act of 1984, the

24   Court, considering the sentencing guidelines which I've already

25   discussed and the statutory factors from Congress set forth in

Page 40

1    18 USC Section three 3553, paren A, commits the defendant,

2    Doctor Awerbuch, to the custody of the United States Bureau of

3    Prisons for a term of 32 months on each Count to run

4    concurrently.  That is two years and eight months.  I recommend

5    a designated facility with a mental health treatment program.

6    Mr. Kriger, remind me where he wants to be sent.

7         **MR. KRIGER:**  I am going to address that when you are

8    all done.

9         **THE COURT:**  No. You're going to address it now.

10        **MR. KRIGER:**  Your Honor, I have been trying to get a

11   hold of the Bureau of Prisons to see -- his son is in medical

12   school in Miami.  And his partner, former wife, also resides in

13   Miami part-time.  But he doesn't live in that district.  And

14   I'm trying to get a hold of the Bureau of Prisons to see if I

15   can get him designated down there and I have not gotten an

16   answer yet, if they will do it outside this region.

17        **THE COURT:**  That's something that our department

18   would find out for you in a minute.

19        **MR. KRIGER:**  Okay. Because I called.

20        **THE COURT:**  If he wants to go to Miami I will

21   recommend it and I have a commitment from the Bureau of Prisons

22   if they can't do it, they will inform me.  Since they made that

23   commitment about a year ago, I only had one can't do letter.

24        **MR. KRIGER:**  The other option, your Honor, I was

25   going to say --

Sentencing Hearing
*Monday, February 26, 2018*

Page 41

1      **THE COURT:**  The answer to your question is, yes, they

2   can do it.  The other question is, will they do it?  And I am

3   not sure they will answer that.

4      **MR. KRIGER:**  Could I ask for just seven days before

5   you do the commitment to try to finalize this.  And I will

6   certainly notify the Court of a requested designation.

7      **THE COURT:**  Let me ask you this.  Do you have an idea

8   of how many federal prisons there are in the state of Florida

9   because I don't know.

10      **MR. KRIGER:**  There is Miami, and there is Pensacola,

11   the two we are looking at.

12      **THE COURT:**  Pensacola is 400 miles away.

13      **MR. KRIGER:**  Right. The other space is Morgantown.

14   If you could just give me -- he wanted to think about once I

15   found the options.  If you can give me seven days, I will

16   notify Mr. Lang or even if you can give me 48 hours.

17      **THE COURT:**  48 hours is okay because we won't have it

18   back by then.  But I am shaking my head because that's the

19   first thing on my local local --

20      **MR. KRIGER:**  I know that and I was aware of that.

21   That is why I have been trying to figure that out.

22      **THE COURT:**  Even without those local local rules, my

23   practice was at least geography.  Have you gone into the

24   question of programs that would be available to him?

25      **MR. KRIGER:**  Yes.  I was going to ask that you

Sentencing Hearing
Monday, February 26, 2018

Page 42

1  recommend the RDAP program.  If you notice in the Presentence

2  Report --

3          **THE COURT:**  Is that because he has a drug problem or

4  because he wants to get out six months early?

5          **MR. KRIGER:**  Because it has an alcohol program.

6          **THE COURT:**  Stop.  You don't have to tell me to look

7  at anything.  You are an officer the court.  I believe what you

8  say.  I just wish you -- what are the security levels at Miami

9  or Pensacola?

10         **MR. KRIGER:**  They both have federal prison camps.  So

11  the only other place we're considering --

12         **THE COURT:**  I don't want to hear your ruminations

13  about where.  I will give you 48 hours to tell me where.

14         **MR. KRIGER:**  Thank you, your Honor.

15         **THE COURT:**  And I will recommend comprehensive drug

16  program.  And that, by the way, my recommendation, even if it

17  were followed, they will do their own evaluation.  And even if

18  you are evaluated to qualify, because of our budgeting things

19  nationally and before -- well, two or three years ago we were

20  told that 70 percent of the people who qualify by their

21  evaluation get into the program.  But if you qualify you don't

22  have any history of recent guns or violence.  And I wish you

23  luck.

24      Upon release from imprisonment, you will be placed on

25  supervised release for a term of three years per Count to run

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 43

1   concurrently.  It is further ordered you pay a special

2   assessment of a hundred dollars per Count which is a total of

3   two hundred dollars.   And the restitution we have already

4   discussed.  And the amount of $3,141,267 and no cents shall be

5   ordered forthwith.  And as we have heard, that has been taken

6   care of.  I am not imposing a fine.  I am not charging you for

7   the costs of imprisonment or the costs of supervision due to

8   your financial situation.  And the restitution shall be divided

9   between Health and Human Services Medicare Trust Fund of

10  $1,916,694 to $1,224,573.

11       You will not be required to participate in the Inmate

12  Financial Responsibility Program in prison for two reasons.

13  One, as I understand it, it could take up to 25 percent of your

14  earnings in prison to teach you how to spend your own money.  I

15  don't think you need any advice on how to spend money, one.

16  And, two, taking 50-cents of two dollars isn't going to help

17  you anyway other than to perhaps help your teeth and you won't

18  buy as much candy.  But so if they say to you if you don't take

19  this program, you can't do another program, it then becomes

20  your decision if you are going to admit it to that or submit to

21  that.  Okay.

22       Mandatory drug testing is ordered.  While on supervision

23  you shall abide by the standard conditions as adopted by the

24  United States District Court in the Eastern District of

25  Michigan and shall comply with the following special

Page 44

```
 1   conditions.  You shall provide -- due to your history of mental
 2   health and substance abuse, you shall participate in a program
 3   approved by the Probation Department for mental health
 4   counseling.  If necessary, you shall not use or possess alcohol
 5   in any consumable form, nor shall you be in the social company
 6   of any person who you know to be in possession of alcohol or
 7   illegal drugs or frequent an establishment where alcohol is
 8   served, the consumption on the premises, with the exception of
 9   restitution.  You shall participate in a program approved by
10   Probation for substance abuse which may include testing to
11   determine whether you reverted to the use of drugs or alcohol
12   if necessary.  If you have not made full restitution by the
13   time you get out, part of your supervised release will be to
14   make monthly installment payments on any remaining balance at a
15   rate and schedule recommended by the Probation Department and
16   approved by the Court.  You shall not incur any new credit
17   charges or open additional lines of credit without the approval
18   of the probation officer unless you are in compliance with the
19   payment schedule.  And you shall provide the probation officer
20   access to any requested financial information.  Do have you any
21   questions?
22             THE DEFENDANT:  No, your Honor.
23             THE COURT:  Any objections from the Government?
24             MR. NEAL:  No objections, your Honor.
25             THE COURT:  Defense?
```

Page 45

1          **MR. KRIGER:**  No objections.

2          **THE COURT:**  Stop.  You answered by question.

3          **MR. KRIGER:**  No objections.

4          **THE COURT:**  I am not done.  You have a right to

5    appeal.  If you choose to appeal and cannot afford it, the

6    Court will provide you with the forms.  The case manager and

7    your attorney will help you complete them.  If there are costs

8    such as attorney fees, transcripts, or the like, a filing fee

9    at the Sixth Circuit, the Court -- and you couldn't afford

10   it -- the Court will take care of them.  I'm required to tell

11   you that but I am also, out of a sense of reality, required to

12   tell you that as I recall your Rule 11 Agreement, you have

13   waived your right to appeal if you are sentenced is under 86

14   months or 87 months, whatever the cap was.  And, therefore, if

15   you were to exercise the first right I told you about when the

16   papers were filed with the Sixth Circuit they will look at the

17   Rule 11 Agreement and more likely than not dismiss your appeal.

18   Now, do you have any questions?

19          **THE DEFENDANT:**  No, I don't, your Honor.

20          **THE COURT:**  Let me give you a short preview.  You are

21   going to prison.  You are a first timer.  Your view of prison

22   as is most of ours is influenced by what you see in the movies

23   and on TV.  And sometimes that is true.  A few years ago I have

24   been interviewing prisoners when they get out and I have not

25   had one person report that that happened to do them but I am

Sentencing Hearing
Monday, February 26, 2018

Page 46

1     not naive enough to know that they would report that.  My
2     advice is to take your time, be skeptical of anything that
3     sounds too good to be true.  And your life skills will help you
4     a whole lot in discerning what is going on.
5          The other bit of advice, if you are going to meet people,
6     especially if you end up at a camp, who have done just as bad
7     or worse things than you and have gotten less time, and you can
8     be angry about that.  You can be angry about where I exercised
9     my discretion.  That is normal.  But you cannot let it
10    interfere with the positives when you get out of the prison
11    whether it's learning about people that you probably already
12    know from your prior experience or doing a job that helps
13    people in prison.  That won't be your first job.  More likely
14    than not it will be more of a cleaning job.  But one of the
15    reasons I ask that the attorneys look into more than just
16    geography is because each prison has a group of the same
17    programs and then they have specialty programs.  And we have
18    actually have a couple books in the library, one written by a
19    defense lawyer and one by the Bureau of Prisons that will
20    catalog and categorize what is going on in each prison so you
21    can get something out of it.  And if there is not a program and
22    there is no congruence between program and geography, you can
23    create your own program in terms of literature, art, whatever
24    you are interested in.  And they do have libraries and with the
25    support from outside, books can be sent in.

*Sentencing Hearing*
*Monday, February 26, 2018*

Page 47

1      The key thing is when you get up every morning and

2  especially at the beginning you will be very angry.  You've got

3  to say it yourself, is this going to be a positive day or a

4  negative day?  And if you, as you are there and get used to it,

5  you realize there is no value in negative days other than that

6  day will be gone.  So you are one day closer to release.  If

7  you do the positive thing that day will be gone and you might

8  get something that can you use when you get out or something

9  that satisfies you, whatever your interests.

10      I wish you luck.  You've now finished this segment of your

11  life and you are right.  When you get out, you will be probably

12  62.  And you will have a lot of years in front of you in terms

13  of doing something that satisfies you.  And it will more likely

14  than not not be your old passion of medicine but you might find

15  something more than satisfying but less than passionate.  Good

16  luck.

17           **THE DEFENDANT:**  Thank you.

18           **THE COURT:**  Mr. Kriger?

19        **MR. KRIGER:**  Your Honor, I would ask that you waive

20  the cost of incarceration given the forfeiture as part of the

21  judgment.  And also I would like to talk about a reporting

22  date.  Mr. Neal and I have talked when we mentioned to you in

23  chambers --

24           **THE COURT:**  Stop.  I already waived the costs of

25  incarceration.

Sentencing Hearing
Monday, February 26, 2018

Page 48

1          **MR. KRIGER:**  I didn't hear that.

2          **THE COURT:**  I waived the costs of supervision and the

3    fine.  So you and Mr. Neal have agreed.  Tell me what the

4    agreement is and I will see if I approve it or not.

5          **MR. NEAL:**  Yes, your Honor.  Why don't we simply let

6    the Bureau of Prisons select a turn-in date and Mr. Kriger and

7    I will discuss whether that's appropriate.

8          **THE COURT:**  So you are not objecting to continuance

9    of bond?

10          **MR. NEAL:**  No objection to continuation of bond.

11          **THE COURT:**  Is that what you want, Mr. Kriger?

12          **MR. KRIGER:**  Yes, your Honor.

13          **THE COURT:**  We are done, unless have you something

14    else.

15          **MR. KRIGER:**  I am finished.

16          **THE COURT:**  Thank you.

17          **MR. KRIGER:**  Thank you, your Honor.

18          **MR. NEAL:**  Thank you, Judge.

19                         -   -   -

20

21

22

23

24

25

Page 49

**C E R T I F I C A T I O N**

I, Lawrence R. Przybysz, official court reporter

for the United States District Court, Eastern District of

Michigan, Southern Division, appointed pursuant to the

provisions of Title 28, United States Code, Section 753,

do hereby certify that the foregoing is a correct

transcript of the proceedings in the above-entitled cause

on the date hereinbefore set forth.

I do further certify that the foregoing

transcript has been prepared by me or under my direction.


s/Lawrence R. Przybysz
Official Court Reporter

-   -   -